**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Mark Allen Steinbach, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING SUMMARY** |
| | ) | **JUDGMENT OF DISMISSAL** |
| vs. | ) | |
| | ) | |
| Patrick Branson, Deputy Warden | ) | |
| North Dakota State Penitentiary, | ) | Case No. 1:05-cv-101 |
| | ) | |
| Defendant. | ) | |

_____

Before the court is defendant Branson's motion for summary judgment.  For the reasons

explained below, the court grants the motion and dismisses plaintiff's complaint.

**I.    BACKGROUND**

**A.    The parties and the claims**

Plaintiff, Mark Steinbach, is an inmate at the North Dakota State Penitentiary (NDSP),

serving a life sentence for murder.  He filed this *pro se* civil rights action pursuant to 42 U.S.C. §

1983.

Steinbach complains that NDSP officials are restricting, and in some cases denying, prisoner

visitation with persons whose mailings have generated positive alerts from a device used to screen

mail for drugs.  Steinbach claims the drug screening device is unreliable and generates false alerts,

which, in turn, results in arbitrary restrictions and denials of visitation.

More particularly, Steinbach claims that visitation with his girlfriend was restricted, and then

indefinitely denied for more than three years, based upon false alerts on mail she sent.  Steinbach

also claims that his visitation with others has been restricted, although not denied, when their mail

1

has generated false alerts. Steinbach alleges that the prison's use of the results of the drug screening device to restrict, and in some cases indefinitely deny visitation, violates his constitutional right of association under the First Amendment, his right to be free from cruel and unusual punishment under the Eighth Amendment, and his liberty and due process rights under the Fourteenth Amendment, particularly when it is done without an opportunity for a hearing.

Steinbach is suing Defendant Deputy Warden Patrick Branson in both his individual and official capacities, claiming Branson is responsible for the NDSP's drug screening practices. Steinbach seeks $2,500 in compensatory damages and $200,000 in punitive damages. He also seeks injunctive relief prohibiting the NDSP from using positive results from the drug screening to restrict or deny visitation in an unconstitutional manner in the future.

Branson's motion for summary judgment seeks dismissal on the grounds that no violation of constitutional rights occurred. In the alternative, he seeks dismissal of the individual capacity claims on grounds of qualified immunity.

**B.      The NDSP's visitation policies and the drug-screening equipment**

North Dakota's prison regulations state that all incoming non-legal and non-official inmate mail is subject to inspection for content and contraband. As part of its inspection practice, the NDSP screens inmate mail for controlled substances using a device known as the IONSCAN, which uses ion mobility spectrometry to detect the presence of trace amounts of illegal substances. The NDSP claims that the IONSCAN is one of several devices that have been recommended for drug screening by the National Institute of Justice. The machine was put into service at the NDSP in 2003.

The "Inmate Handbook" sets forth the NDSP's visitation policy. The policy provides that each prisoner is permitted an unlimited number of visits by relatives and up to eight friends. The

policy states that visitation is a privilege and that prison administrators retain the right to exclude any visitor "if it is determined they pose a risk to the facility or they bear a relationship to a legitimate penological interest."  The policy further provides:

> If an inmate is found in possession of contraband upon completion of a visit, the visitor(s) may be suspended from visitation pending investigation by the institution and may be permanently banned from visitation after completion of the investigation.

### C.    The positive screening results and the denials of visitation

The facts surrounding the alleged detection of contraband in mail sent by Steinbach's girlfriend, JoAnn Anderson, along with the subsequent denial of visitation with her, are somewhat sketchy.  The following is what the court has been able to piece together from the submissions of the parties after construing the facts most favorably for Steinbach.

On October 2, 2003, a letter sent by Anderson to Steinbach was selected for screening using the IONSCAN.  The envelope tested positive for trace elements of a controlled substance, Methylenedioxyethylamphetamine (MDEA).[1]  As a result, Steinbach's visitation with Anderson was restricted to secure, non-contact visits unless the IONSCAN happened to be available for personal screening, in which case contact visitation would be permitted if Anderson passed the screening. The record is silent at to whether Anderson made any visits during the period in which her visitation was subject to these restrictions and, if so, whether she successfully passed any screening of her person by the IONSCAN.

Also, there is some evidence that the first piece of Anderson's mail generating a positive alert was subsequently tested by the North Dakota Bureau of Criminal Investigation (BCI) and by

---

[1] Branson's affidavit refers to the substance as "meth."  But it is unclear what relation this compound has to "meth."  Various on-line references consulted by the court suggest this compound is more closely related to the drug ecstasy and is sometimes referred to as "Eve."  There is no dispute, however, that MDEA is a controlled substance.

the Redwood Laboratories in California and that the results were negative, or at least inconclusive, for controlled substances.[2]  Further, there is some indication that the contraband allegedly detected was located under lipstick marks on the outside of the envelope. This is because Warden Schuetzle later wrote the following in March 2004 to a local attorney, presumably retained by Anderson:

> You state in your letter that the first of the two letters sent into our facility by JoAnn was sent to the State Lab for testing and no substance was detected so the State Lab refused to test for the second letter.  This statement is not at all accurate.  The first letter was sent to the State Lab due to the illegal substance being detected only under the lipstick marks on the outside of the letter.  This was clearly a case of intentionally trafficking if the substance would have tested at a high level enough for legal charges.  The substance did not test at a court acceptable level but did test positive again by our equipment after it was received back from the State Lab.  We did not even process the second letter, as we had no intent to prosecute.

On December 1, 2003, another letter sent by Anderson to Steinbach tested positive for a controlled substance.  As a result, Steinbach's visiting privileges with Anderson were terminated, but Anderson was permitted to continue to communicate with Steinbach by letter and by telephone. On December 2, 2003, Branson wrote Anderson advising her of the change of status stating in relevant part the following:

> Due to the second trace detection for illegal substance MDEA in your letter to inmate Mark Steinbach, I believe you present an extremely high risk for trafficking illegal substance(s) into our facility.  Your visiting privileges with Mark Steinbach are terminated as of 12/2/03.  We are also denying you access to all facilities of the North Dakota Department of Corrections and Rehabilitations Prisons Division.

In telephone conversations and written correspondence that followed, Anderson vehemently denied any attempt to introduce drugs into the prison.  At one point, she offered to submit to a polygraph conducted by prison officials, but this offer was declined.  Anderson offered several

---

[2] The additional testing is referred to directly only by the plaintiff and is mentioned in passing in the attachments to Branson's submissions.  Since there is some evidentiary basis for the allegations, the court must view the facts in the light most favorable to Steinbach and treat these allegations as true for purposes of summary judgment.

possible explanations for the positive screening results.  One was that the positive results may have

been caused by the chemical composition of the "kisses" placed on the envelopes, which she sprayed

with perfume.  Branson addressed this subject in his December 2, 2003, letter stating in part:

> The first letter had you questioning the possibility of lipstick covering the area producing the positive test.  At that time we discussed your actions of kissing the letters and spraying perfume on the letters.  My advice to you was to stop such practices, as we were not going to assume such substances were producing false positive tests.  In other words, we were not going to ignore the positive test for an illegal substance based on your argument that the lipstick or perfume may have cause [sic] the MDEA trace detection.  You claim the detection on the second letter must be linked to the perfume you sprayed on the letter.

Curiously, Branson (who has been proffered as the NDSP's expert on the use of the IOSCAN in the

affidavits filed in support of the motion for summary judgment) did not say in the December 2,

2003, letter that false positives could not be created by such substances.[3]  Anderson also suggested

that the alerts may have been caused by prescription pain medication she was taking.[4]

Also, on March 5, 2004, in response to a letter from Anderson requesting restoration of

visiting privileges, Warden Schuetzle stated he would not reinstate visiting privileges at that time,

but that her correspondence would be monitored and that, if  no traces of controlled substances were

found for a period of at least one year, he would consider allowing some type of restricted visitation.

---

[3]  Steinbach claims that NDSP visitors who are physically screened with the IONSCAN are warned that perfumes, and the like, can sometimes cause the machine to alert.  As explained in more detail later, the information offered by Branson regarding the operation of the  IONSCAN, and particularly  the science behind its drug detecting capabilities, consisted largely of conclusory statements by Branson, much of it hearsay, for which no showing was made that he possessed the necessary technical and scientific qualifications to make.  Noticeably absent was an operating manual for the IONSCAN.

[4]  Branson suggests that Anderson was lying when she offered this explanation because prison officials monitored a telephone conversation between her and Steinbach shortly afterwards in which she allegedly stated she had stopped taking the pain medication because the doctor would no longer prescribe it to her.  At this point, however, the court is unable to evaluate Branson's claim of deception because of the lack of information regarding the timing of the phone call relative to the sending of the letters that tested positive.  For all the court knows, there may be some innocent explanation based on a difference in timing and no inconsistency.

In April 2004, in response to yet another letter from Anderson, Warden Schuetzle advised that visiting privileges with Steinbach would be reinstated on December 2, 2004, if no traces of controlled substances were detected in future correspondence. But he warned that visiting privileges could be terminated permanently if traces of controlled substances were again detected.

On November 18, 2004, less then a month prior to the expiration of the one-year waiting period imposed by Warden Schuetzle, a third letter from Anderson tested positive for a controlled substance. Anderson telephoned Branson to discuss the rejection of the letter and she was told that her visiting privileges would be indefinitely terminated until further notice. On December 10, 2004, Branson followed up with a letter advising Anderson that her visiting privileges would be terminated for a period of at least one year.

Branson now claims that Steinbach's visiting privileges with Anderson have been restored - at least in some form. But, this did not occur until February 1, 2007, which was after Steinbach initiated this action. Further, Branson's affidavit offers no explanation for why the visiting privileges were restored, much less an explanation of why restoration was appropriate on February 1, 2007, and not, for example, in December 2005, which would have been one year after Branson's last letter on December 10, 2004, in which he stated the denial of privileges would be for at least one year.

The length of the denial of even noncontact visitation with Anderson extended from December 1, 2003, to February 1, 2007 - more than three years. Whether or not significant, Branson offered no evidence that a denial of noncontact visitation with a family member or close friend for this duration is a typical prison practice.

6

Steinbach asserts he is not a drug user or dealer and that he has never tested positive for drugs, much less ever been disciplined for drug use or being in possession of contraband. These assertions must be taken as true at this point, particularly since nothing was offered to contradict them.

Branson has proffered virtually no evidence regarding how the IONSCAN detected the substances that were alleged to be found, except that it is capable of detecting some drugs down to the level of one-trillionth of a gram. In particular, Branson offered no evidence regarding the amounts allegedly detected in the correspondence, much less what amount is considered significant.[5] Nevertheless, for the reasons discussed below, it does not make any difference given what appears to be the law in the Eighth Circuit regarding prisoners' lack of rights to visitation with any particular person.

## II.   DISCUSSION

### A.   Governing law generally

In order to succeed on his claim pursuant to 42 U.S.C. Section 1983, Steinbach must prove (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the violation was committed by a person acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988). In his motion for summary judgment, Branson claims, in part, that no constitutional violation has occurred; hence, there is no § 1983 claim. There is no dispute about the fact that he was acting under color of state law.

---

[5] For all the court knows at this point, the IONSCAN is capable only of screening items for the presence of contraband down to one-trillionth of gram and is not capable of further discrimination. If that is actually the case, it would appear to be only a screening device, and the court remains to be convinced that any rational conclusions could be drawn from the presence of such trace amounts on incoming mail. These points are addressed in more detail later.

In the alternative, Branson seeks to be excused from any liability in his individual capacity based upon a claim of qualified immunity.  What Branson must prove to prevail on this defense will be discussed later.

The following well-established principles govern the court's consideration of  Branson's motion for summary judgment:

> Summary judgment is appropriate only when the pleadings, depositions and affidavits submitted by the parties indicate no genuine issue of material fact and show that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The party seeking summary judgment must first identify grounds demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Such a showing shifts to the non-movant the burden to go beyond the pleadings and present affirmative evidence showing that a genuine issue of material fact exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Ind. Co., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d (1986). The non-movant "must show there is sufficient evidence to support a jury verdict in [her] favor." Nat'l Bank of Commerce v. Dow Chem. Co., 165 F.3d 602, 607 (8th Cir.1999). "Factual disputes that are irrelevant or unnecessary will not be counted," Anderson, 477 U.S. at 248, 106 S.Ct. 2505, and a mere scintilla of evidence supporting the nonmovant's position will not fulfill the non-movant's burden, id. at 252, 106 S.Ct. 2505.

Uhiren v. Bristol-Meyers Squibb Company, Inc., 346 F.3d 824, 827 (8th Cir. 2003).

**B.     The First and Fourteenth Amendment claims**

    **1.     The issue, over which there is some doubt, is whether prisoners have <u>any</u> constitutional protection against arbitrary denials of noncontact visitation that are more than just temporary**

Generally speaking, prisoners retain only those constitutional rights that are consistent with their prisoner status, but subject to prison officials being able to limit the exercise of such rights by regulation or action as necessary to meet the legitimate needs of the penal system.  E.g.,  Turner v. Safley, 482 U.S. 78, 84 (1987); Wolff v. McDonnell, 418 U.S. 539, 556-563 (1974); Procunier v.

Martinez, 416 U.S. 396, 404-407 (1973); Murphy v. Missouri Department of Corrections, 372 F.3d 979, 986-987 (8th Cir. 2004).  In this case, Steinbach is claiming violations of his substantive rights under the First, Eighth, and Fourteenth Amendments, as well as a violation of his Fourteenth Amendment right to procedural due process.

Before turning to the details of Steinbach's claims, it helpful to first narrow the issues. Steinbach does not claim that, at any point in time, he was allowed no visitors.  Thus, this is not a case involving a complete denial of all visitation. Also, it appears clear in the Eighth Circuit that prisoners have no constitutionally protected right to "contact" visitation.  See Phillips v. Norris, 320 F.3d 844, 847 (8th Cir. 2003); Harmon v. Auger, 768 F.2d 270 (8th Cir. 1985).  Consequently, Steinbach has no claim with respect to those persons who were placed on restricted, noncontact visitation as a  result of the use of the IONSCAN.  See also  Block v. Rutherford, 468 U.S. 576 (1983).

The more troublesome issue, and the one to that the court devotes most of its attention, is whether Steinbach has any constitutionally protected interest in noncontact visitation with particular family members or close friends.  Or, to phrase the issue somewhat differently:  Can prison officials arbitrarily deny visitation with a particular family member or close friend, even when, as in this case, the denial is more than temporary,  Steinbach has not been convicted of any disciplinary violation for which the denial of visitation is a penalty, and the denial, arguably, bears no rational relationship to a reasonable penological purpose - at least assuming the facts most favorably to Steinbach?

In the Eighth Circuit, the short answer appears to be that prisoners have no constitutionally protected rights to visitation with any particular person. See Ware v. Morrison, 276 F.3d 2002 (8th Cir. 2002); Taylor v. Armontrout, 894 F.2d 961 (8th Cir. 1990).  Consequently, in the Eighth Circuit,

it appears that prison officials are free to arbitrarily deny visitation, even indefinitely, with a prisoner's mother, wife, child, or close friend without being subject to federal court scrutiny - at least absent a total denial of visitation with all persons.[6]

The court's construction of the Eighth Circuit cases, while shared by others, is not without some doubt, however.  Also, other federal courts have reached contrary conclusions, and the Supreme Court does not appear to have squarely decided the issue.  In fact, the Supreme Court's most recent visitation decision casts some doubt on the approach that has been taken by the  Eighth Circuit.  These points are addressed in more detail below.

### 2.     The Supreme Court decisions

In order to properly explain the Eighth Circuit's holdings, along with why there may be some doubt about them, requires first a discussion of the significant Supreme Court precedent, beginning with Procunier v. Pell, 417 U.S. 817 (1973).  In Pell, the Court addressed the question of whether a prison regulation that prohibited press visits with specific inmates violated the prisoners' First Amendment rights of free speech - particularly, the opportunity to communicate grievances to legislative and executive decision-makers through the channel of public opinion using the press as a conduit.   The Court's conclusion was that  the regulation did not violate First Amendment rights given the alternative forms of communication that were still available.

In terms of this case, three things are significant about the Court's decision in Pell.  First, the Court reaffirmed that prisoners retain First Amendment rights that are not inconsistent with their prisoner status.   Id. at 822.   Second, the test that the Court used to analyze the challenged

---

[6]  In the Eighth Circuit, it appears the only thing that may be subject to federal court scrutiny is a denial of all visitation that is more than temporary.  This  may violate the Eighth Amendment's ban on cruel and unusual punishment - a subject to be addressed later.

infringement upon free speech was essentially the test that the Court later expanded upon and formally adopted in Turner v. Safley, *i.e.*, whether there is a rational connection between the challenged practice infringing upon a prisoner's constitutional rights and a legitimate penological objective. Id.; Turner v. Safley, 482 U.S. 78, 89 (1987). Third, one of the alternatives for communication that the Court stressed as still being available, in addition to the obvious one of mail, was prison visitation with others, including family and friends, which the Court suggested could be an alternative conduit to the dissemination of the prisoners' grievances. Id. at 823-828 & n.4-5. In other words, there is the suggestion in Pell that visitation has a free speech nexus.

The next significant Supreme Court decision involving visitation is Block v. Rutherford, supra. In Block, the issue was the denial of "contact" visitation to pretrial detainees. The Court upheld the practice, concluding there is a rational connection between denial of "contact" visitation and the legitimate penological purpose of maintaining security and keeping contraband out. While the case involved pretrial detainees, who arguably possess greater rights than convicted prisoners, the test the Court used to evaluate the challenged restriction was, again, what was to become the Turner v. Safley test. Further, what is also significant is the fact that the Court stated:

> In rejecting the District Court's order, we do not in any sense denigrate the importance of visits from family or friends of the detainee.

468 U.S. at 589. In an earlier footnote, the Court had observed that "noncontact" visitation was freely allowed with some 63,000 visits occurring in a particular month. Id. at 578 n.1.

The next case of note is the Supreme Court's decision in Turner v. Safley, supra. In that case, the Court formally adopted a four-factor test for determining the validity of prison regulations or practices that, arguably, infringe upon prisoners' constitutional rights. 482 U.S. at 89-91. The

11

test, which will be discussed in more detail later, is commonly referred to as the <u>Turner v. Safley</u>, or more simply, the <u>Turner</u> test.

In addition, <u>Turner</u> is also significant in terms of how it applied the test to the prison practices that were the subject of the case, one involving a prohibition on inmate-to-inmate correspondence and the other involving restrictions upon inmate marriage. The Court held that the four-factor test applied to both since the first raised First Amendment concerns, <u>id.</u> at 93, and the second a claimed infringement upon fundamental liberties that include the right to marry, <u>id.</u> at 94-95. And, while the Court upheld the first practice as having a rational connection to a legitimate penological interest, <u>id.</u> at 91-93, it found no rational connection with respect to the second, concluding that the marriage restrictions were unduly restrictive and facially invalid under the four-factor test, <u>id.</u> at 94-100. In terms of this case, the latter holding is of particular significance and also raises the following question: Does it make sense that prison officials may be required to allow prisoners to marry, but have unfettered discretion in terms of whether the spouse can ever visit?


In 1989, the Supreme Court addressed two additional cases of significance. The first is <u>Thornburgh v. Abbott</u>, 490 U.S. 401 (1989). The issue in that case was the test to be used in analyzing restrictions placed upon what published material prisoners could receive. In addition to reaffirming the applicability of the <u>Turner</u> test to the alleged infringement of prisoners' First Amendment rights, the Court commented on what it characterized as the "legitimate demands of those on the 'outside' who seek to enter [the prison] . . . , in person or through written word." <u>Id.</u>

at 407.  The Court stated that access was "essential" for a number of persons, including "families and friends who seek to sustain relationships" with the prisoners.  Id. [7]

The same term the Court also decided  Kentucky Department of Corrections v. Thompson, 490 U.S. 454 (1989), which the Eighth Circuit cases cited earlier primarily rely upon to reach the conclusion that prisoners have no constitutionally protected right to visitation with particular persons.  In Kentucky Department of Corrections, the sole issue was whether certain Kentucky prison regulations governing visitation created a "liberty" interest such that the denial of visitation entitled the prisoner to a hearing.  The lower courts had concluded the regulations did create a liberty interest, but the Supreme Court reversed, concluding that the mandatory language necessary to find a state-created liberty interest was not present.   In passing, the Court also noted that the plaintiffs had not based their argument on the Due Process Clause of the Fourteenth Amendment, itself, and offered the following observations:

> Respondents do not argue - nor can it seriously be contended, in light of our prior cases - that an inmate's interest in unfettered visitation is guaranteed directly by the Due Process Clause. We have rejected the notion that "*any* change in the conditions of confinement having a substantial adverse impact on the prisoner involved is sufficient to invoke the protections of the Due Process Clause." (Emphasis in original.) Meachum v. Fano, 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976). This is not to say that a valid conviction extinguishes every direct due process protection; "consequences visited on the prisoner that are qualitatively different from the punishment characteristically suffered by a person convicted of crime" may invoke the protections of the Due Process Clause even in the absence of a state-created right. Vitek v. Jones, 445 U.S. 480, 493, 100 S.Ct. 1254, 1263, 63 L.Ed.2d 552 (1980) (transfer to mental hospital). However, "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the

---

[7]  The importance of visitation for the emotional and physical well-being of prisoners, as well as to their ability to successfully re-integrate into society if they will have that opportunity, has been recognized in other cases and by corrections experts.  E.g., Kentucky Department of Corrections, 490 U.S. at 468-469 & n.4-5 (Marshall, J., dissenting) (citing cases and various prison standards); Wirsching v. Colorado, 360 F.3d 1191, 1198 (10th Cir. 2004); Laaman v. Helgemoe, 437 F. Supp. 269, 32–321 (D.N.H. 1977).

Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." <u>Montanye v. Haymes</u>, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976). *The denial of prison access to a particular visitor "is well within the terms of confinement ordinarily contemplated by a prison sentence,"* <u>Hewitt v. Helms</u>, 459 U.S., at 468, 103 S.Ct., at 869, *and therefore is not independently protected by the Due Process Clause.*

<u>Id.</u> at 460-461 (emphasis added).  Notably, the test that the Court applied to reach the conclusion in the emphasized language, that prisoners have no due process rights to visitation with particular persons, is similar to the one later adopted in the watershed case of <u>Sandin v. Conner</u>, 515 U.S. 472 (1995).

Obviously, the Court's statement in <u>Kentucky Department of Corrections</u>, that denial of access to a particular visitor is not independently protected by the Due Process Clause, supports the broader conclusion of the Eighth Circuit that prisoners have no constitutional rights to visitation with particular persons.  In fact, that is exactly how the dissent in <u>Kentucky Department of Corrections</u> characterized the impact of the majority opinion.  Justice Marshall writing for the three dissenters stated the following:

As a result of today's decision, correctional authorities at the Kentucky State Reformatory are free to deny prisoners visits from parents, spouses, children, clergy members, and close friends for any reason whatsoever, or for no reason at all. Prisoners will not even be entitled to learn the reason, if any, why a visitor has been turned away.

490 U.S. at 465-466 (Marshall, J., dissenting).

Nevertheless, there are reasons to believe that <u>Kentucky Department of Corrections</u> should not now be applied that broadly.  First, the earlier highlighted statement in <u>Kentucky Department of Corrections</u> was clearly *dicta*.  Second, the Court cited no authority for the statement. The citation to <u>Hewitt v. Helm</u> was only to the quoted language "is well within the terms of confinement ordinarily contemplated by a prison sentence," and there was no discussion in  <u>Hewitt</u> about

visitation. Third, there are other parts of the majority opinion that suggest it should not be applied that broadly, despite the rhetoric of the dissenters.  There is the earlier reference to "unfettered" visitation in the quoted language as not being protected by the Due Process Clause, which suggests that more-restricted visitation may be protected.  More importantly, the denials of visitation that the Court stated gave rise to the challenge of the regulations in Kentucky Department of Corrections involved two mothers and a prisoner's girlfriend, who were denied visitation for only limited periods of time.[8]  490 U.S. at 458.  Fourth, the Court did not address the possibility that the First Amendment or the right of intimate association might provide some constraint on the denial of visitation over and above what the Due Process Clause may or may not impose on its own. Consequently, it may have been for this reason that the Court did not apply the Turner test used in Pell and Block, and to which the Court returned in Overton v. Bazzetta, 539 U.S. 126 (2003), despite Overton being not only post Kentucky Department of Corrections, but also post Sandin.  Fifth, as discussed in more detail below, the Court conspicuously ignored Kentucky Department of Corrections in its most recent visitation decision in Overton.

Before turning to the Supreme Court's decision in Overton, it is necessary to first discuss the lower court's opinion in Bazzetta v. McGinnis, 286 F.3d 311 (2002), rev'd in part sub nomine Overton v. Bazzetta, supra.  In Bazzetta, the Sixth Circuit concluded that a number of restrictions placed on noncontact visitation by the Michigan Department of Corrections violated the prisoners' rights of association under the First Amendment, the ban on cruel and unusual punishment imposed

---

[8]  The Court stated that one of the mothers was denied visitation for six months and that the other mother and prisoner's girlfriend were denied visitation for what the Court stated was a "limited" time.  490 U.S. at 458.  The regulations at issue provided that persons who were denied visitation for any of a number of listed reasons would not be allowed to visit again for up to six months, except  for persons who brought dangerous drugs or contraband into the prison who could be suspended indefinitely.  Id. at 456-458 & n.1-2.  In this case, Branson points to the Supreme Court's upholding of these regulations as authority for the indefinite suspension of Anderson for more than three years.

by the Eighth Amendment, and the substantive protections of the liberty interest of the Fourteenth Amendment.  Id. at 316-323.  The challenged limitations included absolute prohibitions on visitation by children who were not part of a prisoner's immediate family (thereby prohibiting visits by brothers and sisters who are minors and nephews and nieces) and an indefinite prohibition on all visitation (except from attorneys and clergy) if an inmate had two or more major misconduct violations relating to substance abuse with the possibility of reinstatement of visitation  privileges after two years.  In addition, the Sixth Circuit held that the failure to allow for a hearing, when the total ban on visitation was imposed for substance abuse, violated the prisoners' rights to procedural due process even though separate hearings were held to determine in each case whether the predicate substance abuse violations had occurred.  Id. at 323.

More particularly, with respect to the First Amendment claim, the Sixth Circuit concluded in Bazzetta  that prisoners do retain a limited constitutional right  to freedom of association, stating the following:

> We hold that prisoners do retain a limited right to freedom of association - specifically non-contact visits with intimate associates - even while incarcerated. This follows clearly from Pell, where the Supreme Court held that a prisoner retains a First Amendment right unless it is incompatible with incarceration. See 417 U.S. at 822, 94 S.Ct. 2800. Imprisonment does sharply limit inmates' right of association. For instance, prisoners who pose a security risk have no right to remain in the general prison population, see Hewitt v. Helms, 459 U.S. 460, 468, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) (holding temporary, nonpunitive transfer to administrative segregation does not violate a prisoner's constitutional rights), and prisoners have no constitutional right to contact visits, see Bazzetta, 133 F.3d at 383 (holding prisoners have no constitutional right to contact visits); accord Thorne v. Jones, 765 F.2d 1270, 1274 (5th Cir.1985) (holding incarcerated individuals maintain no right to physical association). But the right of association is not wholly extinguished by imprisonment.

Id. at 316.  Consistent with this holding, the Sixth Circuit analyzed the challenged restrictions utilizing the four-factor Turner test.  Id. at 317-322.  Also, the Court expressly  rejected the

argument that the Supreme Court's decision in <u>Kentucky Department of Corrections</u> foreclosed the

conclusion that prisoners do have limited rights of association with respect to noncontact visitation.

<u>Id.</u> at 316-317.

As for the substantive due process claim, the Sixth Circuit applied the <u>Sandin</u> test and held

that the challenged regulations also constituted an impermissible infringement of rights guaranteed

under the Fourteenth Amendment.  The Court stated:

> Finally, as imposed the punishment violated prisoners' due process rights. Not
> every prison deprivation merits due process; for a punishment to require due process
> it must exceed the sentence imposed in a notably "unexpected manner," <u>Sandin v.</u>
> <u>Conner</u>, 515 U.S. 472, 483, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), or constitute
> a change in conditions of confinement that amounts to a "grievous loss." <u>Vitek v.</u>
> <u>Jones</u>, 445 U.S. 480, 488, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). Applying these
> measures, we find that a complete ban on all visitors is such a grievous loss that it
> infringes on a liberty interest protected by substantive due process. Imprisonment
> inevitably limits who can visit a prisoner, but it does not dissolve inmates' marriages
> nor end their parental rights. A complete ban on all visitors cuts the prisoner off from
> all personal ties, constituting qualitatively greater isolation than is imposed by a
> prison sentence, and is an atypical and significant hardship far beyond the expected
> hardships of prison.

<u>Id.</u> at 323.  And, for essentially the same reasons, the Sixth Circuit concluded the regulations

violated the Eighth Amendment, focusing upon their "unusual" impact in terms of whether the result

was "cruel and unusual" punishment.  <u>Id.</u>

On appeal, the Supreme Court in <u>Overton</u> granted review on the issues of whether the

regulations in question violated the substantive provisions of the First, Eighth, and Fourteenth

Amendments, but not on the procedural due process issue.  The Supreme Court reversed the Sixth

Circuit, but, for the most part, avoided deciding what Justice Thomas in his concurring opinion

stated was the issue the Court was asked by the petitioners to consider:  "[w]hether prisoners have

a right to non-contact prison visitation protected by the First and Fourteenth Amendments." <u>Overton</u>

<u>v. Bazzetta</u>, 539 U.S. at 139 (Thomas, J., concurring).   With respect to the First Amendment and

the Fourteenth Amendment substantive due process challenges, the majority in <u>Overton</u> applied the four-factor <u>Turner</u> test and concluded that there was a rational relationship between the challenged regulations and a legitimate penological interest. 539 U.S. at 131-136.  And, with respect to the Eighth Amendment challenge, the Court concluded that regulation providing for indefinite suspension of all visitation for two or more substance abuse violations (which the Court characterized as being only for a "limited period"), did not amount to cruel and unusual punishment as that phrase had been construed by prior precedent. <u>Id.</u> at 136-137.

Several things are significant about <u>Overton</u> with respect to the First and Fourteenth Amendment claims.  First, the Court applied the four-factor <u>Turner</u> test to both the First and Fourteenth Amendment challenges, which was consistent with its earlier decisions in <u>Pell</u> and <u>Block</u>, but not <u>Kentucky Department of Corrections</u>. Second, the Court did not once cite to <u>Kentucky Department of Corrections</u> as authority for anything.  Third, although it had the opportunity to do so, the Court did not hold that prisoners have *no* constitutionally protected interest in noncontact visitation, even though that would have disposed of all of the issues with respect to the challenged restrictions, except, perhaps, for the total ban on visitation that also raised Eighth Amendment concerns.  In fact, the Court appears to have left the issue open.

With respect to the claim of associational rights (and without making clear whether the source of those rights would be the First Amendment or the liberty interests of the Fourteenth Amendment, or both), the Court in <u>Overton</u> stated the following:

> We do not hold, and we do not imply, that any right to intimate association is altogether terminated by incarceration or is always irrelevant to claims made by prisoners. We need not attempt to explore or define the asserted right of association at any length or determine the extent to which it survives incarceration because the challenged regulations bear a rational relation to legitimate penological interests. This suffices to sustain the regulation in question. See <u>Turner v. Safley</u>, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

18

539 U.S. at 131-132. Then, when addressing the regulation imposing the total ban on visitation based on two or more drug violations, the Court commented on the severity of the restriction and stated the following:

> Respondents also contest the 2-year bar and note that reinstatement of visitation is not automatic even at the end of two years. We agree the restriction is severe. And if faced with evidence that MDOC's regulation is treated as a de facto permanent ban on all visitation for certain inmates, we might reach a different conclusion in a challenge to a particular application of the regulation. Those issues are not presented in this case, which challenges the validity of the restriction on noncontact visits in all instances.

Id. at 134. And later, when discussing the Eighth Amendment claim, the Court did not foreclose the possibility of even an Eighth Amendment challenge to more severe restrictions on visitation when it stated:

> Respondents also claim that the restriction on visitation for inmates with two substance-abuse violations is a cruel and unusual condition of confinement in violation of the Eighth Amendment. The restriction undoubtedly makes the prisoner's confinement more difficult to bear. But it does not, in the circumstances of this case, fall below the standards mandated by the Eighth Amendment. Much of what we have said already about the withdrawal of privileges that incarceration is expected to bring applies here as well. Michigan, like many other States, uses withdrawal of visitation privileges for a limited period as a regular means of effecting prison discipline. This is not a dramatic departure from accepted standards for conditions of confinement. Cf. Sandin v. Conner, 515 U.S. 472, 485, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Nor does the regulation create inhumane prison conditions, deprive inmates of basic necessities, or fail to protect their health or safety. Nor does it involve the infliction of pain or injury, or deliberate indifference to the risk that it might occur. See, e.g., Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); Rhodes v. Chapman, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). *If the withdrawal of all visitation privileges were permanent or for a much longer period, or if it were applied in an arbitrary manner to a particular inmate, the case would present different considerations. An individual claim based on indefinite withdrawal of visitation or denial of procedural safeguards, however, would not support the ruling of the Court of Appeals that the entire regulation is invalid.*

Id. at 136-137 (emphasis added).

19

### 3.   The lower federal courts are split on whether prisoners have <u>any</u> constitutionally protected interest in noncontact visitation

A number of lower federal courts have held that prisoners have a constitutionally protected interest in noncontact visitation or have concluded the issue is of sufficient doubt so they have applied the four-factor <u>Turner</u> test to evaluate whether the challenged practices pass constitutional muster.  <u>E.g.</u>, <u>Wirsching v. Colorado</u>, 360 F.3d 1191 (10th Cir. 2004) (suggesting that prisoners retain First Amendment rights to familial association, but affirming the denial of visitation of a sex offender with his child based on application of the <u>Turner</u> test); <u>Bazzetta v. McGinnis</u>, <u>supra</u>; <u>Caraballo Sandoval v. Onsted</u>, 35 F.3d 521, 525 (11th Cir. 1994) (suggesting the existence of a First Amendment right, but upholding the denial of visitation based on the application of the <u>Turner</u> test); <u>Bellamy v. Bradley</u>, 729 F.2d 416, 420 (6th Cir. 1984) (no "absolute" right to visitation and limitations may be imposed to meet penological objectives); <u>Towle v. Commissioner of New Hampshire Dept. of Corrections</u>, 2007 WL 1133218, *6-7 (D.N.H. 2007) (prisoners retain a First Amendment right of intimate association, but concluding that the regulations at issue satisfied the <u>Turner</u> test); <u>Calderon v. State of Connecticut Dept. of Corrections</u>, 2006 WL 3085716, *9 (D. Conn. 2006)(suggesting a First Amendment right of association with regard to visitation); <u>King v. Frank,</u> 328 F. Supp. 2d 940, 945 -946 (W.D. Wis. 2004) (stating that the Supreme Court's use of the <u>Turner</u> test in <u>Overton</u> suggested that prisoners retain some rights to visitation); <u>Austin v. Hopper</u>, 15 F. Supp. 2d 1210, 1231-33 (M.D. Ala.1998) (characterizing the Eleventh Circuit's decision in <u>Caraballo-Sandoval</u>, <u>supra</u>, as holding that prisoners retain some First Amendment rights to visitation); <u>Laaman v. Helgemoe</u>, 437 F. Supp. 269, 320-321 (D.N.H. 1977) (unreasonable restrictions upon visitation implicate First and Eighth Amendment rights); <u>Hamilton v. Saxbe</u>, 428 F. Supp. 1101, 1111-13 (N.D. Ga. 1976) (recognizing limited constitutional protections to visitation

with non-family members); cf. Von Minden v. Jankowski, 2007 WL 1958615, *7-8 (W.D. Tex. 2007) (applying the Turner test to a denial of visitation to a pre-trial detainee).

Other courts, however, have concluded that there is no constitutionally protected right to visitation with a particular person, even noncontact visitation with family and friends. E.g., Thorne v. Jones, 765 F.2d 1270, 1272-74 (5th Cir.1985) (stating that visitation is subject to the discretion of prison officials and rejecting any First Amendment or right of association to visitation); Abuhoran v. Morrison, 2005 WL 2140537, *7 (E.D. Pa. 2005) ("courts have uniformly held that the constitution does not confer a right to visitation upon prisoners and their family members" and citing other cases); DeWitt v. Wall, 2001 WL 1136090, *3 (D.R.I. 2001) (prisoners have no First Amendment or right of association to visitation); Fennell v. Carlson, 466 F. Supp. 56 (D.C. Okl. 1978) (same); White v. Keller, 438 F. Supp. 110, 115 (D. Md. 1977) (same).

### 4.    The Eighth Circuit decisions

The first Eighth Circuit case of significance is Harmon v. Auger, 768 F.2d 270 (8th Cir. 1985).   In Harmon, the court rejected a challenge to a reformatory policy of  suspending contact visitation for prisoners who had been found guilty of disciplinary violations for possession of drugs. The court held that prisoners have no "liberty" interest under the Fourteenth Amendment to contact visitation, citing the Supreme Court's decision in Block v. Rutherford, which held the same for pretrial detainees.   Id. at 273.   The court also held that the reformatory regulations at issue did not give rise to a state-created liberty interest.

The next Eighth Circuit case of note is Taylor v. Armontrout, 894 F.2d 961 (8th Cir. 1990) (as amended).   In Taylor, an out-of-state adult son of a prisoner, who was on the prisoner's visiting list, presented himself for visitation but was turned away several times even after obtaining assistance of the Salvation Army.   By all accounts, the son was neat in appearance, respectful, and

had proper identification.  Later, the prisoner, with the assistance of his prison case worker, persuaded the warden to allow the son to visit.  But, by that time, the son was unable to visit because he had been hospitalized on account of an accident.  The prisoner sued and the district court dismissed the complaint as being frivolous.

The Eighth Circuit in <u>Taylor</u>, however, reversed.  The court concluded that the mandatory language in the state's regulations governing visitation gave rise to a state-created liberty interest that was protected under the Fourteenth Amendment.  As a result, the court remanded the case to the district court to determine what process was due and whether the prisoner had been afforded the necessary process.

<u>Taylor</u>'s approach of finding a protected liberty interest based only upon mandatory language in the state's prison regulations appears now to be largely foreclosed by the Supreme Court's decisions in <u>Sandin</u> and <u>Overton</u>.  However, what remains of significance is the court's reliance upon <u>Kentucky Department of Corrections</u> for its other conclusion, which was that prisoners do not have a constitutionally protected right to visitation under the Fourteenth Amendment itself and that any liberty interest protecting visitation would have to be state-created and arise out of the prison's regulations.  894 F.2d at 963.

The next Eighth Circuit decision, and the one which appears to be dispositive in this case, is <u>Ware v. Morrison</u>, 276 F.3d 2002 (8th Cir. 2002).  In that case, Ware, a federal prisoner, was found to be in possession of contraband following a series of visits by three females, one of whom was his wife.  Following a hearing, the disciplinary hearings officer found Ware guilty and sanctioned him with a loss of good-time credits and a disciplinary transfer, but no denial of visitation.  Later, without a hearing, the warden suspended Ware's visitation with his wife and the two other females for eighteen months because he suspected that they had been involved in the smuggling of the

contraband to Ware.  Later, when Ware was transferred to a different prison, the new warden kept

the same suspension in place.

Ware then brought a *Bivens* action alleging violations of Due Process under the Fifth

Amendment.  The defendants moved to dismiss or, in the alternative, for summary judgment on the

basis of qualified immunity.  The district court denied the motion for summary judgment and entered

an order temporarily restoring Ware's visitation with his wife pending the outcome of the case.

The Eighth Circuit in Ware reversed the district court relying upon Sandin and Kentucky

Department of Corrections.  The court concluded that the eighteen month "suspension" of visitation

did not impose an atypical and significant hardship in relation to the ordinary incidents of prison life.

The court stated:

> We must determine whether Ware, while serving time in federal prison, has a
> constitutional right to visitation. Government actions affecting the conditions of
> prison confinement implicate a prisoner's constitutional rights only where the actions
> impose an atypical and significant hardship on the inmate in relation to the ordinary
> incidents of prison life. Sandin v. Conner, 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132
> L.Ed.2d 418 (1995).
>
> Ware's loss of visitation privileges is within the ordinary incidents of
> confinement and cannot be considered an atypical and significant hardship. See Ky.
> Dep't of Corr. v. Thompson, 490 U.S. 454, 460-61, 109 S.Ct. 1904, 104 L.Ed.2d 506
> (1989) (holding that an inmate's interest in visitation does not rise to a liberty interest
> protected under the Due Process Clause); Harmon v. Auger, 768 F.2d 270, 272 (8th
> Cir.1985) (holding that a prisoner does not have a liberty interest in contact visits).
> The discipline imposed upon Ware simply does not fall outside the expected
> parameters of incarceration. See Key v. McKinney, 176 F.3d 1083, 1086-87 (8th
> Cir.1999) (rejecting due-process claim challenging the use of shackles for
> punishment because discipline by prison officials for a variety of misconduct falls
> within the expected parameters of incarceration).
>
> In a case strikingly similar to this one, Caraballo-Sandoval v. Honsted, 35
> F.3d 521, 524 (11th Cir.1994) (per curiam), a prisoner's visitation privileges with his
> wife were suspended due to suspicion that the wife was passing contraband to the
> prisoner. The Eleventh Circuit affirmed the dismissal of the suit, holding that the
> prison officials were entitled to qualified immunity and that the decision to curtail
> visitation privileges was discretionary and did not implicate the prisoner's
> constitutional right to due process. Id. at 525. We agree with the Eleventh Circuit in

Caraballo-Sandoval and *we hold that Ware had no constitutionally protected interest implicated by the suspension of his visitation privileges.*

Id. at 387-388 (emphasis added).

### 5.   Conclusions regarding the First and Fourteenth Amendment claims

Given Ware, and to a lesser degree Taylor, the court concludes that the law in the Eighth Circuit is that prisoners do not have a constitutionally protected right to visitation with a particular person.[9]  This is because the "suspension" of visitation in Ware, as in this case, was for a significant amount of time and involved a person close to the prisoner.  And, even though no claim was made in Ware based on the First Amendment or a right of association, the court did not suggest these as a possible basis for a different conclusion even though it explicitly relied upon the Eleventh Circuit's decision in Caraballo-Sandoval.  In Caraballo-Sandoval, the Eleventh Circuit rejected both a due process challenge and a right of association claim under the First Amendment to the termination of the visitation that occurred in that case. As to the latter claim, the Eleventh Circuit stated:  "[A]s to the First Amendment claim, inmates do not have an absolute right to visitation, such privileges being subject to the prison authorities' discretion provided that the visitation policies meet legitimate penological objectives."  Caraballo-Sandoval, 35 F.3d at 525.

The court's construction of the Eighth Circuit cases, however, is not without doubt - particularly given the lack of any explicit discussion in Taylor and Ware of a possible infringement of First Amendment and intimate association rights.  In fact, in a more recent case involving another challenge to a denial of "contact" visitation, the court stated the following, without any mention of

---

[9]  Others have reached similar conclusions regarding the state of the law in the Eighth Circuit.  See  Moore v. Cross, 2007 WL 835417 *8 n.5 (D. Minn. 2007); Michael B. Mushlin, 2 Rights of Prisoners § 12.2 & n.5 (3rd ed.).

its prior decisions in <u>Taylor</u> and <u>Ware</u> or to the Supreme Court's decision in <u>Kentucky Department of Corrections</u> upon which <u>Taylor</u> and <u>Ware</u> substantially relied:

> A prisoner does not have a liberty interest in contact visitation. <u>Bazzetta v. McGinnis</u>, 124 F.3d 774, 779 (6th Cir.1997); <u>see</u> <u>Thorne v. Jones</u>, 765 F.2d 1270, 1274 (5th Cir.1985). There is no indication that Phillips was denied non-contact visitation, thus the issues in <u>Bazzetta v. McGinnis</u>, 286 F.3d 311 (6th Cir.2002), <u>cert. granted</u>, <u>Overton v. Bazzetta</u>, 537 U.S. 1043, 123 S.Ct. 658, 154 L.Ed.2d 514 (2002) are not implicated.

<u>Phillips v. Norris</u>, 320 F.3d 844, 847 (8th Cir. 2003).

Moreover, even if the court is correct in concluding that the law in the Eighth Circuit is that prisoners have no constitutionally protected right to visitation with a particular person, the Eighth Circuit's position is, itself, subject to question given the contrary holdings by other lower federal courts and by the Supreme Court's use of the <u>Turner</u> test in <u>Overton</u> without any mention of <u>Kentucky Department of Corrections</u>.  In fact, if this court was not faced with the prior Eighth Circuit precedent, it would conclude, as have a number of other lower federal courts, that prisoners do have some constitutionally protected interest in noncontact visitation, such that the <u>Turner</u> test must be used to consider the legitimacy of a denial of noncontact visitation that is more than temporary.[10]

---

[10]    Arguably, an arbitrary denial of noncontact visitation with family and close friends infringes upon prisoners' constitutional rights in two ways. First, the infringement upon the communications, which are the primary focus of noncontact visitation, implicates First Amendment free speech rights.  <u>Procunier v. Pell</u>, 417 U.S. at 823-828 & n.4-5 (discussed earlier in text above); <u>cf.</u> <u>Procunier v. Martinez</u>, 416 U.S. at 404-407 (restrictions upon prisoner mail with family and friends).  In particular, visitation is an important safeguard against institutional abuse in terms of providing a conduit to the outside world for prisoner grievances.  While prisoners may sometimes be able to communicate their grievances and concerns effectively by mail or over the telephone, there are times they are not capable of doing so.  Moreover, the alternative forms of communication do not allow the person receiving the communication to fully evaluate the concerns either from a severity or a credibility standpoint by the nonverbal communication that takes place.

Second, an arbitrary denial of visitation with family and close friends, arguably, infringes upon the fundamental right to intimate association, whatever might be its constitutional mooring.  <u>See</u> <u>Board of Directors of Rotary International v. Rotary Club of Duarte</u>, 481 U.S. 537, 545-546 (1987); <u>Roberts v. Unites States Jaycees</u>, 468 U.S. 609, 617-620 (1984); <u>cf.</u> <u>Turner v. Safley</u>, 482 U.S. at 95-98 (recognizing the right of prisoners to marry - at least in some situations).  While it does not appear that the Supreme Court has explicitly extended the right of intimate association to

Nevertheless, Ware as not been clearly overruled, and the court is constrained to follow it. Consequently, the defendant is entitled to a dismissal of Steinbach's First and Fourteenth Amendment claims, particularly given that there is no evidence that Steinbach was completely denied all visitation or is threatened with such a denial.

### C.   The Eighth Amendment claim

While the Supreme Court in Overton did not absolutely foreclose an Eighth Amendment challenge to a denial of visitation, it appears from the earlier quoted language that, before a denial of visitation would be considered "cruel and unusual" within the meaning of the Eighth Amendment, it would have to be a total denial of all visitation for an extended period of time.   As noted earlier, this is not the case here.   Consequently, based on Overton, the court concludes that Steinbach has no cognizable Eighth Amendment claim.

### D.   The procedural due process claim

The court's conclusion that Steinbach has no constitutionally protected interest in visitation with any particular person based on Eighth Circuit precedent negates any procedural due process claim under the Fourteenth Amendment.   If the court is wrong, however, and Steinbach has some

---

close friends, such as Steinbach's girlfriend, it is a logical extension of the Court's prior precedent.  See id.; Wilson v. Taylor, 733 F.2d 1539, 1543 (11th Cir.1984). And, in terms of the free speech nexus, whether the person is a family member or close friend is irrelevant since the impact of the infringement is the same.

A close friend may be all that some prisoners have - either because they have no family or their family has abandoned them.  Moreover, placing close friends in the same category as family need not open the floodgates.  Prison officials could still be permitted to impose reasonable restrictions upon the numbers of persons that a prisoner is allowed on the prisoner's visiting list and the frequency of visitation.  Also, prison officials would still be free to prohibit even noncontact visitation by those who have legitimately objectionable backgrounds.

Finally, recognizing some minimal First and Fourteenth Amendment right to visitation would not unduly restrict the ability of prison officials to stem the flow of contraband.  First, the right could be limited to noncontact visitation. Second, prison officials could still be allowed to suspend noncontact visitation as an appropriate discipline for violations of prison rules.  Third, even apart from disciplinary suspensions, there may be good reasons for allowing prison officials the flexibility of being able to temporarily suspend visitation with a particular family member or friend for any reason, including mere suspicion or a need to conduct further investigation, and only require a justification that would withstand scrutiny under the Turner v. Safley test for longer denials.

constitutionally protected interest under the First Amendment, or by way of a right of association,

then he may also be entitled to due process. This is because the Due Process Clause protects against

denials of liberty without due process, and one source of "liberty" interests protected under the

Fourteenth Amendment is the Constitution itself.  See, e.g., Wilkinson v. Austin, 545 U.S. 209, 221

(2005); Procunier v. Martinez, 416 U.S. at 418.[11]

In terms of what process may be due, the Supreme Court recently emphasized the following

in Wilkinson:

> A liberty interest having been established, we turn to the question of what
> process is due an inmate whom Ohio seeks to place in OSP. Because the
> requirements of due process are "flexible and cal[l] for such procedural protections
> as the particular situation demands," Morrissey v. Brewer, 408 U.S. 471, 481, 92
> S.Ct. 2593, 33 L.Ed.2d 484 (1972), we generally have declined to establish rigid
> rules and instead have embraced a framework to evaluate the sufficiency of
> particular procedures. The framework, established in Mathews v. Eldridge, 424 U.S.
> 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), requires consideration of three distinct
> factors: "First, the private interest that will be affected by the official action; second,
> the risk of an erroneous deprivation of such interest through the procedures used, and
> the probable value, if any, of additional or substitute procedural safeguards; and
> finally, the Government's interest, including the function involved and the fiscal and
> administrative burdens that the additional or substitute procedural requirement would
> entail." Id., at 335, 96 S.Ct. 893.

---

[11]   In particular, the Court stated in Wilkinson:
The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty,
or property; and those who seek to invoke its procedural protection must establish that one of these
interests is at stake. A liberty interest may arise from the Constitution itself, by reason of guarantees
implicit in the word "liberty," see, e.g., Vitek v. Jones, 445 U.S. 480, 493-494, 100 S.Ct. 1254, 63
L.Ed.2d 552 (1980) (liberty interest in avoiding involuntary psychiatric treatment and transfer to
mental institution), or it may arise from an expectation or interest created by state laws or policies, see,
e.g., Wolff v. McDonnell, 418 U.S. 539, 556-558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (liberty
interest in avoiding withdrawal of state-created system of good-time credits).
545 U.S. at 221.  And, in Procunier, the Court observed:
The interest of prisoners and their correspondents in uncensored communication by letter, *grounded
as it is in the First Amendment*,  is plainly a "liberty" interest within the meaning of the Fourteenth
Amendment even though qualified of necessity by the circumstance of imprisonment.
416 U.S. at 418 (emphasis added).

545 U.S. at 224-225.  Given the competing interests at stake here, it may very well be that a written post-deprivation notice of the basis for the denial of visitation, along with an opportunity to persuade a senior prison-official that a mistake has been made, would be sufficient.  Cf., Procunier v. Martinez, 481 U.S. at 417-419.  If so, the NDSP's formalized grievance process would likely be more than satisfactory.

In this case, from everything the court has reviewed so far, it appears that prison officials informed Steinbach and Anderson of the reason for the denial of visitation and allowed them both an opportunity to make an argument for why the visitation should not have been terminated, along with subsequent opportunities to make a pitch for restoration of visiting privileges.   The fact that prison officials did not agree does not mean there was a deprivation of procedural due process. Nevertheless, there may still remain material facts in dispute with respect to this issue.

E. **If the court is obligated to apply the __Turner__ test, there are disputed issues of material fact as to whether Steinbach's rights were violated - at least based on the present record**

1. **Introduction**

As noted, there is a  substantial question of whether the court should be using the Turner test to evaluate the challenged practices of the NDSP in this case.  For this reason, the court will apply the test to the current record so that the parties have the benefit of the court's decision in the event of an appeal.

In  Murphy v. Missouri Department of Corrections, supra, the Eighth Circuit summarized the four-factor Turner test and noted the lesser level of scrutiny it imposes as compared to what would normally be the case for constitutional infringements occurring outside the prison setting. The court stated the following:

Although prisoners retain their constitutional rights, limitations may be placed on the exercise of those rights in light of the needs of the penal system. Constitutional claims that would otherwise receive strict scrutiny analysis if raised by a member of the general population are evaluated under a lesser standard of scrutiny in the context of a prison setting. *Turner v. Safley*, 482 U.S. 78, 81, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). A prison regulation or action is valid, therefore, even if it restricts a prisoner's constitutional rights if it is "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89, 107 S.Ct. 2254. Turner sets forth four factors that courts should consider in making that determination. First, we ask whether there is a "valid rational connection" between the prison regulation and the government interest justifying it. Id. at 89-90, 107 S.Ct. 2254. Second, we consider whether there is an alternative means available to the prison inmates to exercise the right. Id. at 90, 107 S.Ct. 2254. Third, we examine whether an accommodation would have "a significant 'ripple effect'" on the guards, other inmates, and prison resources. Id. Fourth, we evaluate whether there is an alternative that fully accommodates the prisoner "at de minimis cost to valid penological interests." Id. at 90-91, 107 S.Ct. 2254.

<u>Murphy</u>, 372 F.3d at 982-983.

2.    **Application of the four-factor <u>Turner</u> test**

a.    **Whether there is a rational connection between the challenged practice and the penological interest justifying it**

The first <u>Turner</u> factor requires that there be a rational connection between the challenged prison practice and the penological interests justifying it.  In this case, the penological interest served by the use of the IONSCAN is keeping contraband out of the prison.  The challenged practice is the use of the IONSCAN results to conclude that Anderson had "intentionally" attempted to introduce contraband into the prison and then use this as the sole basis for denying even noncontact visitation with Anderson.

Obviously, keeping contraband out of the prison is a legitimate penological objective.  Also if Anderson had  "intentionally" attempted to introduce drugs into the prison, there is no question that prison officials should be allowed to impose tough restrictions - even possibly prohibiting visitation altogether.  This is because, even with noncontact visitation, a visitor with a demonstrated

propensity to introduce drugs into the prison remains a security risk while on the prison grounds in terms of the ability to pass drugs to others, including unscrupulous prison staff.  And, given limited prison resources, there may be a good argument for prison officials not having to employ extraordinary security measures to deal with visitors who have demonstrated a propensity for breaching prison security and introducing contraband.

In this case, the problem upon summary judgment is not the legitimacy of the claimed penological objective.  Rather, it the questions of material fact that exist with respect to whether the results of the IONSCAN screening can rationally be used not only to support the proffered justification for the denial of visitation in this case, which is that Anderson had deliberately attempted to introduce contraband into the prison, but also any future denial, particularly one that is more than temporary.

So far, the only evidence proffered by Branson to support the denial in this case is: (1) that the IONSCAN alerted to the presence of trace amounts of an allegedly illegal substance in letters sent by Anderson on three separate occasions; (2) that the IONSCAN is a very sophisticated device and is capable of detecting trace amounts of illegal substances, in some cases down to the trillionth of a gram according to one study prepared for the National Institute of Justice; (3) that the IONSCAN is recognized by the National Institute of Justice as being a suitable "drug-screening" device with another study concluding  that devices of this type "provide our best alternative for *augmenting* drug screening in the mailrooms of correctional facilities[;]"  and  (4) that Branson has been trained in the operation of the device.

The problem with this evidence - most of which is conclusory and unsupported hearsay - is that it leaves unanswered a number of important questions, particularly given the evidence marshaled by Steinbach,[12] including the following:

- What amount of illegal substances need be present in order to reasonably conclude someone is attempting to introduce drugs into the prison? Is a trillionth of a gram enough?[13]

- Does the IONSCAN simply screen for trace amounts of illegal substances at the outer limits of its detection capabilities - in the trillionths of a gram for some substances? Or, does it measure the amount of the illegal substances detected at various levels of significance, similar to alcohol testing devices commonly used by law enforcement to determine whether subjects have reached a specified level of intoxication? If it is the former, is the IONSCAN capable of being set at different levels of sensitivity, and, if so, what level

---

[12] Steinbach's evidence includes: an affidavit from Anderson denying that she used illegal drugs and attempted to introduce them into the prison; an affidavit from Steinbach's ex-wife claiming that her visitation had been restricted as a result of IONSCAN alerts, even though she had not attempted to smuggle drugs in the mail; Steinbach's own affidavit in which he denies ever possessing, using, or dealing illegal drugs and noting that he has never been found to have been in violation of prison regulations relating to the possession or dealing of drugs; and the evidence that one or more subsequent lab tests on the first envelope mailed by Anderson that the IONSCAN alerted may not have detected the presence of illegal substances and that the explanation by prison officials for this disparity was that the detection methods used by the laboratories were not as sensitive as those employed by the IONSCAN.

In his brief, Branson argues that the court should give no weight to Anderson's affidavit because her denials are contrary to the alerts generated by the IONSCAN. However, this simply begs the same questions that the court raises regarding the IONSCAN evidence.

[13] For example, it may be that small amounts of drugs placed on an envelope or behind a stamp will, when licked, produce a physiological response. But, what is the amount that will produce that response with respect to the drugs detected in this case? Is it a trillionth of a gram? And, is the amount that would produce a physiological response the appropriate threshold level to conclude that someone is deliberately attempting to introduce drugs into the prison or is it something lower, given that a person can have bad intent even though failing to meet an objective? And, if it is something lower, is it all the way down to a trillionth of a gram?

was it set at in this case?  If it is the latter, what amounts of illegal substances were actually detected?[14]

- What is the error rate in terms of false positives at the level of sensitivity employed in this case?

- What are the possibilities that the trace amounts came from other sources as a result of cross-contamination after the subject mail left Anderson's possession, including:  other mail handled by the USPS that may be contaminated; the USPS's mail sorting equipment; a "dirty" environment in the prison mail room; or even a "dirty" IONSCAN resulting from a  failure to properly clean it?  Even if Anderson was the source of the contamination, what are the possibilities that she simply passed on the trace amounts as a result of "innocent" cross-contamination?

- What are the possibilities for confounding results, *i.e.*, the suspected detection of an illegal substance when the compounds being detected, in fact, come from a legal substance?  Is there any possibility that prescription drugs or perfumes, for example, may cause a false alert?

- What is required to insure that the IONSCAN is operating correctly?  Does the device need to be periodically calibrated, and, if so, was this done?

---

[14]    Branson claims in his affidavit that the first Anderson envelope that the IONSCAN alerted to was "saturated" with illegal drugs and that Anderson obviously had intended to introduce contraband into the prison.  This may very well be, but Branson provides no quantities for the drugs allegedly detected, much less an amount that would qualify as "saturated."  Moreover, this appears to be the same envelope that one or more laboratories later tested and may have been  unable to detect any contraband.  For all the court knows at this point, the IONSCAN simply alerted to the presence of a trace amount of substance so minute that it would be unreasonable to draw the inference that Anderson "deliberately" attempted to introduce contraband into the prison.

- Who was operating the machine when it alerted to Anderson's mail?  Was the person properly trained in its operation?  Are there any written protocols or checklists that must be followed?

- Did the officials who relied upon the IONSCAN's results as a basis for the denial of Anderson's visitation understand the significance of the results and any limitations that may be inherent in the use of the equipment?

The questions that the court has raised are not idle ones.  For example, a  number of courts have questioned the evidentiary significance of detecting only trace amounts of a controlled substance given the possibilities for cross-contamination.  E.g., Muhammed v. Drug Enforcement Agency, Asset Forfeiture Unit, 92 F.3d 648, 653 (8th Cir 1996) (noting that it is well-accepted that most currency in the United States is contaminated with trace amounts of cocaine and stating that the "fact of contamination, alone, is virtually meaningless and gives no hint of when or how the cash became so contaminated."); United States v. $5000.00 in U.S. Currency, 40 F.3d 846, 849 (6th Cir.1994) ("Cocaine attaches - in a variety of ways - to the bills, which in turn contaminate others as they pass through cash registers, cash drawers, and counting machines at banks and commercial establishments."); Jones v. U.S. Drug Enforcement Admin., 819 F. Supp. 698 (M.D. Tenn. 1993). In fact, in Jones, the court discussed evidence showing that both money in general circulation and the Federal Reserve Bank's sorting equipment tested positive for trace amounts of cocaine at levels substantially higher than the minimum amounts the IONSCAN is capable of detecting.  The court stated:

> As the Drug Enforcement Administration's own chemists reported in the memorandum of the results of their experiments (admitted at trial in this case), currency in general circulation in this country is contaminated with traces of narcotics. Specifically, the chemist found that one-third of the bills in a randomly selected sample were contaminated with between 2.4 and 12.3 nanograms of cocaine

per bill. See Finding 14; Plaintiff's Exhibit 18, at 3. The belts used at Federal Reserve Banks to sort currency were contaminated with approximately 200 nanograms of cocaine per belt. Id. This evidence merely echoes that which has come to the attention of other courts. See $53,082 in U.S. Currency, cited above, 985 F.2d at 250, n. 5 (quoting Dirty Money, United States Banker, October 1989, at 10, which discussed a study by Lee Hearn, Chief Toxicologist for Florida Dade County Medical Examiner's Office, in which he found that 97% of the bills from around the country tested positively for cocaine, and noting that clean bills are contaminated in banks when they come in contact with contaminated ones); $639,558.00 in U.S. Currency, 955 F.2d at 714, n. 4 (citing Crime and Chemical Analysis, 243 Science 1554, 1555 (1989), which described the same study and stated that the contaminated bills carried an average of 7.3 micrograms of cocaine per bill); United States v. $83,375 in United States Currency, 727 F.Supp. 155, 160 (D.N.J.1989) (describing testimony of Jay Poupko, Ph.D., who found in a study that 96% of the bills in circulation were contaminated); $80,760.00 in U.S. Currency, 781 F.Supp. at 475-76, n. 32 (quoting a newspaper article describing the results of a study at National Medical Services in Willow Grove, Pennsylvania-80% of the bills tested were contaminated). Although the studies disagree with respect to the percentage of bills contaminated (between one-third and 97%), and with respect to the amount of cocaine residue per bill (between 2.4-12.3 nanograms and 7.3 micrograms), it cannot be doubted that contaminated currency is widespread.

Id. at 720 (footnote omitted).

More particularly, with respect to the use of ion mobility spectrometers, courts have raised similar concerns regarding the significance of the results, the possibilities for cross-contamination, and the potential for false positives.  See, e.g., Gray v. Bruce, 26 Fed.Appx. 819, 823-824, 2001 WL 1580940 (10th Cir. 2001) (also citing other cases); United States of America v. Ten Thousand Seven Hundred Dollars and No Cents ($10,700.00) in United States Currency, 258 F.3d 215, 231-232 (3rd Cir. 2001).  In Gray v. Bruce, the Third Circuit stated the following:

Mrs. Gray alleged sufficient facts to support her contention that the particular methods the guards used to search her were unreasonable because of the likelihood of cross-contamination FN2 and that the method actually caused an unreliable and false result that lead to the choice between a further substantial invasion of her privacy rights or the loss of her visitation rights. She thus stated a claim for violation of her Fourth Amendment right to be free from an unreasonable search, the dismissal of which was premature.

FN2. We take judicial notice of a case in which an FBI agent/expert witness testified that some ion mobility spectrometers have "proven to be unreliable"

and in which he also testified that, "even if the ion mobility spectrometer correctly characterized the [ ] residues, because no control swabs from the hands of the evidence collection personnel were submitted, a determination as to the source of the [ ] residues cannot be made." Conlon v. United States, 959 F.Supp. 683, 685 (D.N.J.1997). We also note that other § 1983 plaintiffs have alleged that law enforcement personnel, the scientific community, and the makers of ion spectrometers are aware that the devices "may provide a false positive reading for the presence of heroin in products of a high alkaline composition." Ezenwa v. Gallen, 906 F.Supp. 978, 988 (M.D.Pa.1995). We mention these cases only to support our conclusion that Mrs. Gray has stated facts sufficient to support her contention that the swab search to which she was subjected was arbitrary and unreasonable, and not to express an opinion about the merits of her claim.

26 Fed.Appx. at 823-824.[15]

Moreover, one of the studies prepared for the National Institute of Justice that Branson relies upon in his affidavit, but which he did not submit, makes a number of statements that demonstrate the legitimacy of the concerns expressed by this and other courts.   After noting that the IONSCAN Model 400B is capable of detecting meth and cocaine down to a level of 0.01 nanograms and ecstacy (MDMA) down to 0.05 nanograms (a nanogram is one billionth of gram), the study stated the following with respect to the use of ion mobility spectrometry generally:

> [P]eople in the technology field often explain a nanogram by having a non-technical person imagine taking a paper clip and cutting it into a million pieces, then taking one of those pieces and dividing it into a thousand pieces - one of those pieces is a nanogram!  Test results showed that these technologies can find this small of an amount (see Table 2.3-1). *Now practitioners can begin to understand why there may be "false alarms" when using this technology – it finds extremely small amounts – amounts that can easily be from contamination.*

---

[15]   Branson claims in his brief that the IONSCAN has been judicially accepted and cites several cases.  The cases cited, however, mention the IONSCAN only in passing, and none address the questions that the court has raised. Morever, acceptance of the results to establish probable cause for further investigation is one thing; reliance upon the results to make final substantive decisions of constitutional significance is another.

Robert Butler, <u>Mailroom Scenario Evaluation, Final Report, Prepared for the National Institute of Justice</u> at 8-9 (November 21, 2002) ("<u>Mailroom Scenario Evaluation</u>") (emphasis added).[16]  Later, the report also concluded in part:

> The OMDL and mailroom testing showed that trace detection systems are sensitive to very small drug particles. This high sensitivity can be both a blessing and a curse. High sensitivity will allow for very small drug amounts to be found within mail items but can also lead to "false alarms" from cross contamination.  When using trace detection technology one must be very aware of an instruments "alarm setting" and where this setting will place the system's performance.

<u>Id.</u> at 25.  Finally, the report stated that, for portable desktop units like the IONSCAN 400B, "we see higher detection probabilities accompanied by extremely high false alarm rates," and there is included a corresponding chart, which suggests, for example, that the false alarm rate for the IONSCAN 400B's detection of cocaine is 31% at a 94% probability level of detection.  <u>Id.</u> at 30.


Finally, in concluding that the evidence presented by Branson  is too conclusory to be of any value, this court is not alone.   In a forfeiture action in which the federal government needed only to establish probable cause, the Third Circuit expressed the same concerns about the conclusory evidence that was proffered by the government in that case with respect to the results from a ion scanning device.  The court stated:

> We reach the same conclusion with respect to the evidentiary significance of the results from the ION Scan Analysis on the currency and the car. The government simply has not produced evidence concerning the reliability of this particular testing process or the training and qualifications of the tester, two factors which, of course, bear on the reliability and accuracy of the results. Instead, the parties' stipulation of

---

[16]  This appears to be the same study as the one referenced in Branson's affidavit, although it may be a later version, since it is dated November 21, 2002.  The version the court located on the Internet was accompanied by a cover sheet that showed that it had been received by the United States Department of Justice in March 2003 as Document No. 199048.  Whether the <u>Mailroom Scenario Evaluation</u> report is legitimate and good science remains to be seen.  At this point, however, it further illustrates why court needs more information than what Branson has provided so far.

facts merely incorporates the test results without providing any explanation of how the test measures the levels of narcotics on the currency, what the test results showed with respect to the levels and types of narcotics detected, and why those results were scientifically significant when compared to the results on other parts of the vehicle, or for that matter, when compared to "the norm." Also, the parties' stipulation does not provide any indication that the test itself was administered properly so as to ensure reliability of the results. The only evidence we do have in the record are the actual test results plotted on graphs, A-28 to A-33, a report from the individual who administered the scan explaining the logistics of how he conducted the test, i.e., testing each item separately, A-81 to -82, and a cursory explanation in the Allegretto affidavit that the test "showed high levels of cocaine residue" on the currency. A-6. But the documents the government has provided in the record do not provide sufficient information to guide us in evaluating the evidentiary significance of the test results, even though it is the government that bears the initial burden of establishing that it had probable cause to initiate the forfeiture proceeding.

　　　Thus, the government has left us to our own devices to decipher the meaning of the test results and evaluate their evidentiary significance in establishing probable cause to forfeit the currency. Given the circumstances, we simply cannot accept the government's conclusory statement that the test results show claimants' involvement in "significant drug activity." We conclude that the lack of credible information in the record concerning the ION Scan Analysis compels the conclusion that the results cannot be considered a factor weighing in the government's favor in the overall probable cause analysis.

United States of America v. Ten Thousand Seven Hundred Dollars and No Cents ($10,700.00) in

United States Currency, 258 F.3d 215, 231-232 (3rd Cir. 2001) (footnote omitted).[17]

In summary, it may very well be that there are simple answers to the court's questions regarding the significance and relevancy of the IONSCAN results.[18]   But, at this point, the conclusory evidence proffered by Branson proves little and is insufficient to carry his burden upon

---

[17]   Sitting on the panel by designation was Senior Judge Bright from the Eighth Circuit.  In a concurring opinion, he referred to this and other evidence proffered by the government as "chimerical" and " flimsy."  Id. at 234-235.

[18]   The court is not saying the necessary evidence does not exist, only that it has not been presented.  Further, it is not at all clear that Branson is qualified to provide the necessary answers, since there is no indication that he has the requisite scientific knowledge and training.  The North Dakota State Laboratories Department, however, may have people who are qualified since they routinely test for illegal substances using sophisticated equipment.

summary judgment with respect to the first Turner factor.[19]  The court concludes that there are disputed material facts with respect to the issue of whether there is a reasonable basis for using the IONSCAN results on incoming mail to deny noncontact visitation, particularly when the denial is more than temporary,[20] and this includes the denial of visitation that occurred with respect to Anderson.

### b.     The other Turner factors

The first Turner factor is the most important.  See Morrison v. Hall, 261 F.3d 896, 907 (9th Cir. 2001).  Consequently,  an extended discussion of the remaining factors is unnecessary given the court's conclusion that material issues of disputed fact exist with respect to the first factor.  The court notes, however, that, the first time trace elements of contraband were allegedly detected on Anderson's mailing, her visitation was restricted, but not denied.  Likewise, Steinbach alleges that prison officials similarly restricted, but did not deny, visitation by Steinbach's ex-wife when her correspondence also allegedly tested positive.  Consequently, in terms of the remaining Turner factors, there also appears to be material issues of fact as to why suspending visitation for a short period of time to conduct further investigation, or restricting visitation to noncontact visitation if no

---

[19]  Not only is the evidence insufficient with respect to the proffered basis for the indefinite suspension, i.e., that Anderson had intentionally attempted to introduce drugs into the prison, it is insufficient with respect to other possible bases for the denial that were not relied upon.  For example, the presence of a sufficient amount of drugs on one of the envelopes, such that Steinbach would get a physical reaction by licking it, for example, may be of concern even if Anderson had acted unintentionally.  Also, the presence of trace elements that are not enough to create a physiological reaction may suggest, nevertheless, that Anderson may be a drug user, or a person who associates with drug users, and is a risk to smuggle contraband for this reason.  But, with respect to either of these possible justifications, the same questions remain regarding the significance of the IONSCAN results and whether it can be used for anything more than an initial screening that requires further investigation and determination.

[20]  As the court indicated earlier, it may very well be reasonable for prison officials to have the flexibility of being able to temporarily deny noncontact visitation based upon mere suspicion, including a positive alert from an IONSCAN, without being subject to federal court scrutiny.  What may be problematic, however, is using the results of the IONSCAN for denials of noncontact visitation that are more than temporary - a purpose that the IONSCAN may not be well-suited for.

attempt is going to made to prove something other than the presence of trace elements, is not a

sufficient alternative to an indefinite denial when it is based only on the presence of trace amounts

of contraband detected in incoming mail. If, in part, the answer is lack of staff or facilities, some

evidence regarding the number of persons on restricted visitation, what facilities are or are not

available, and how often this problem actually occurs may be required.  The one or two conclusory

statements offered by Branson as to these issues proved nothing.

> **F.     The defendant is entitled to qualified immunity regardless of whether plaintiff
> has a viable constitutional claim**

In his motion for summary judgment, Branson has also asserted the defense of qualified

immunity  arising out of the seminal case of  Harlow v. Fitzgerald, 457 U.S. 800 (1982).  In terms

of the applying the defense upon summary judgment, the Eighth Circuit has instructed that two

inquiries must be made:

> Whether an official is entitled to qualified immunity depends upon the "objective
> legal reasonableness" of the official's actions "assessed in light of the legal rules that
> were 'clearly established'"at the time of the actions in question. Anderson v.
> Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (citations
> omitted). The first inquiry is whether the officer's conduct violated a constitutional
> right when the facts are viewed in a light most favorable to the party asserting the
> injury. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).
> If "a violation could be made out on a favorable view of the parties' submissions,"
> id., the next inquiry is whether the constitutional right was clearly established; that
> is, "whether it would be clear to a reasonable officer that his conduct was unlawful
> in the situation he confronted," id. at 201-02, 121 S.Ct. 2151. "If the law did not put
> the officer on notice that his conduct would be clearly unlawful, summary judgment
> based on qualified immunity is appropriate." Id. at 202, 121 S.Ct. 2151.

Robinette v. Jones, 476 F.3d 585, 591-592 (8th Cir. 2007).

In addition, the Eighth Circuit has further instructed that, absent special circumstances, the

court is required to make the necessary inquiries in the proper sequence.  Id. at 592 n.8.  In other

words, the existence or nonexistence of a constitutional right that was violated is the threshold

question and the second inquiry, as to whether the right was clearly established, should not be made until the first has been addressed.  Id.

In this case, the court has concluded that Steinbach possessed no constitutional rights to visitation with respect to particular persons based on controlling Eighth Circuit precedent.  Hence, Branson is entitled to qualified immunity for this reason.  But, even if the court is wrong and Steinbach has a cognizable constitutional claim, the court's prior discussion of the law in this area makes plain that the law was not clearly established.  Hence, Branson is entitled to a dismissal of the claims against him in his individual capacity for this reason as well.

**G.     The case is not moot given Steinbach's request for injunctive relief**

The court's conclusion that Branson is entitled to qualified immunity, regardless of whether there has been a constitutional violation, means that Steinbach no longer has a claim for damages in this case.  This is because Branson's entitlement to qualified immunity eliminates any claim against him personally.  As to the official capacity claims, it is well-established that a suit against a state employee in his official capacity is a suit against the state and that the state has Eleventh Amendment immunity in suit brought under 42 U.S.C. § 1983 from any claim for damages.  E.g., Quern v. Jordan, 440 U.S. 332 (1979);  Edelman v. Jordan, 415 U.S. 651 (1974); Alsbrook v. City of Maumelle, 184 F.3d 999, 1010 (8th Cir. 1999).

Consequently, the only substantive relief that Steinbach would be entitled to if he were to prevail is the possibility of injunctive relief.  See, e.g., Murphy v. State of Arkansas, 127 F.3d 750, 754 (1997).  And, presumably, one of the things that the court could do, if it concluded that Steinbach had been improperly denied visitation with Anderson, would be to order that his visitation privileges with her be restored.  The defendant claims, however, that this has already been done, implicitly suggesting that the matter is now moot.

The voluntary restoration of Anderson's visiting privileges, however, does not make the case moot, even now with grant of qualified immunity and the dismissal of the damage claims.   The alleged violations are reasonably capable of being repeated, and, arguably, there is other injunctive relief within the constraints of 18 U.S.C. § 3626(a)(1)(A) that the court could order to protect against future violations.   See  Missouri Protection and Advocacy Services, Inc. v. Carnahan,  __F.3d __, 2007 WL 2386607, *6 (8th Cir. 2007).

## III.   CONCLUSION AND ORDER

For the reasons explained above, the defendant's motion for summary judgment (Doc. No. 22) is **GRANTED**, and it is hereby **ORDERED** and **ADJUDGED** that plaintiff's claims against the defendant in both his official and individual capacities are dismissed with prejudice.   Each party shall bear its own costs.   The clerk is instructed to enter a judgment of dismissal consistent with this order.

Dated this day 9th of  October, 2007.

/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr.
United States Magistrate Judge